**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TOBY KATZ**<br>**501 N. Clinton Street, Unit 2305**<br>**Chicago, Illinois 60654**<br>**Plaintiff,** | **CIVIL ACTION NO.   22-cv-1012** |

**v.**

**IRON HILL COMPANY**
**579 E. Lafayette Street**
**Norristown, PA 19401,**

**THE LOUDERBACK GROUP, LLC**
**579 E. Lafayette Street**
**Norristown, PA 19401,**

**JOSEPH GRASSO**
**421 North Rose Lane**
**Haverford, PA 19041,**

**DONNA OHARA GRASSO**
**421 North Rose Lane**
**Haverford, PA 19041,**

**JOSEPH GRASSO, JR.**
**1115 Maple Crest Circle**
**Gladwyne, PA 19035**

**MELISSA ANN RUSSO**
**300 Conshohocken State Road**
**Gladwyne, PA 19035**

**MICHAEL GRASSO**
**4106 Fountain Green**
**Lafayette Hills, PA**

**AMANDA GRASSO**
**418 Conshohocken State Road**
**Gladwyne, PA 19035**

**NICHOLAS GRASSO**
**371 Emerald Drive**
**Yardley, PA 19067**

**BRUCE KAPLAN**
**8 Cypress Point Court**
**Blackwood, NJ 08102,**

**ANDRES PAPADOPOULUS**
**418 Conshohocken State Road**
**Gladwyne, PA 19035**

                          **Defendants.**

## COMPLAINT

Plaintiff Toby Katz, by her undersigned counsel, brings this action against Defendants Iron Hill Company, The Louderback Group, LLC, Joseph Grasso, Donna Ohara Grasso, Joseph Grasso, Jr., Melissa Ann Russo, Michael Grasso, Amanda Russo, Nicholas Grasso, Bruce Kaplan, and Andres Papadopoulus (collectively "Defendants"), to bring an end to Defendants' long running and continuing scheme to hinder, delay and defraud the creditors of Joseph Grasso, from collecting on a $23 million plus judgment against Joseph Grasso.   Defendants' scheme includes the fraudulent transfer of assets, filing false and misleading documents with both federal and state courts, and lying to Plaintiff about the ownership and control of multiple assets in order to improperly shield them from judgment.   Plaintiff seeks declaratory and injunctive relief to prevent the Defendants from further hindering, delaying and defrauding Plaintiff.

### Parties

1.     Plaintiff Toby Katz ("Plaintiff") is an individual and a citizen of the State of Illinois, who resides at 501 N. Clinton Street, Unit 2305, Chicago, Illinois 60654.   Ms. Katz is the widow of Marshall Katz ("Marshall"), and the successor to his assets, including a $23 million plus judgment against Defendant Joseph Grasso.

2.     Defendant Iron Hill Company ("Iron Hill") is a Pennsylvania corporation with its principal place of business located at 579 E. Lafayette Street, Norristown, PA 19401.

3.      Defendant The Louderback Group, LLC ("Louderback") is a Pennsylvania limited liability company with its principal place of business located at 579 E. Lafayette Street, Norristown, PA 19401.  Louderback's purported owners are Defendant Joseph Grasso's five children (Defendants Joseph Grasso, Jr., Melissa Ann Russo, Michael Grasso, Amanda Russo, Nicholas Grasso) and Bruce Kaplan.  Bruce Kaplan purports to own 1% of Louderback with Joseph's five children each of whom owns a 19.8% interest.

4.      Defendant Joseph Grasso ("Joseph") is an individual citizen of the Commonwealth of Pennsylvania, who resides at 421 North Rose Lane, Haverford, PA 19041.   Joseph is the President, Treasurer and Secretary of Defendant Iron Hill.   Joseph also controls Defendant Louderback.

5.      Defendant Donna Ohara Grasso ("Donna") is an individual citizen of the Commonwealth of Pennsylvania, who resides at 421 North Rose Lane, Haverford, PA 19041. Donna is married to Joseph.

6.      Defendant Joseph Grasso, Jr. ("Joe Jr.") is an individual citizen of the Commonwealth of Pennsylvania, who resides at 1115 Maple Crest Circle, Gladwyne, PA 19035. Joe Jr. is Joseph's son.

7.      Defendant Melissa Ann Russo ("Melissa") is an individual citizen of the Commonwealth of Pennsylvania, who resides at 300 Conshohocken State Road, Gladwyne, PA 19035.  Melissa is Joseph's daughter.   Melissa claims she is the sole owner of Iron Hill.

8.      Defendant Michael Grasso ("Michael") is an individual citizen of the Commonwealth of Pennsylvania, who resides at 4106 Fountain Green, Lafayette Hills, PA 19444. Michael is Joseph's son.

9.      Defendant   Amanda   Grasso   ("Amanda")   is   an   individual   citizen   of   the

Commonwealth of Pennsylvania, who resides at 418 Conshohocken State Road, Gladwyne, PA 19035.   Amanda is Joseph's daughter.

10.     Defendant Nicholas Grasso ("Nicholas") is an individual citizen of the Commonwealth of Pennsylvania, who resides at 371 Emerald Drive, Yardley, PA 19067. Nicholas is Joseph's son.

11.     Defendant Bruce Kaplan ("Kaplan") is an individual citizen of the State of New Jersey, who resides at 8 Cypress Point Court, Blackwood, NY 08102.   Kaplan is the Chief Financial Officer of Iron Hill and Louderback.   He also serves as Joseph's personal accountant.

12.     Defendant Andres Papadopoulus ("Andres") is an individual citizen of the Commonwealth of Pennsylvania, who resides at 418 Conshohocken State Road, Gladwyne, PA 19035.   Andres is Amanda's husband.

13.     Each of the other Defendants is an insider of Joseph.

### Jurisdiction and Venue

14.     The Court has jurisdiction over this diversity matter pursuant to 28 U.S.C. Section 1332(a) as the amount in controversy exceeds $75,000 and the citizenship of the Plaintiff differs from the citizenship of each of the Defendants.

15.     To the extent that any claims alleged in this Complaint are not within the Court's original jurisdiction, the Court has supplemental jurisdiction over all such claims pursuant to 28 U.S.C. Section 1367(a), as those claims so relate to the claims in this action that they form part of the same case or controversy under Article III of the United States Constitution.

16.     Venue is appropriate in the Eastern District of Pennsylvania pursuant to 28 U.S.C. Section 1391(b) as all but one of the Defendants reside in this District, while the one nonresident Defendant works in this District; a substantial part of the events giving rise to the claims at issue

occurred in this District; and a substantial part of the property at issue is situated in this District.

**FACTS**

**A.      THE ORIGINAL JUDGMENT AGAINST JOSEPH GRASSO**

17.      In or around August 2006, Marshall entered into an agreement with Saxby's Coffee, Inc. ("Saxby's Coffee") to serve as its consultant.   Pursuant to this agreement, Marshall was entitled to monthly and contingent compensation for his services.

18.      Marshall also owned a 10.8% stake in Saxby's Coffee, and was thus entitled to benefit as an owner from the coffee company's success.

19.      In 2007, Joseph orchestrated the sale of Saxby's Coffee for a mere $600,000 to another entity he controlled, which sale wrongly deprived Marshall of the benefit of his ownership interest in Saxby's Coffee.

20.      Thereafter, as a result of Joseph's wrongful conduct, Marshall commenced a state court action against Joseph and others in a matter entitled *Marshall J. Katz v. Joseph Grasso, et al.*, No. 07-CH-24116, (the "State Court Action") in the Circuit Court of Cook County, Illinois County Department, Chancery Division (the "Illinois State Court").

21.      In the Illinois State Court Action, Marshall alleged, *inter alia*, that (i) Saxby's Coffee's sale of its assets to the entity controlled by Joseph constituted a fraudulent transfer, breach of fiduciary duty and tortious interference with certain agreements between Marshall and Saxby's Coffee; and (ii) Joseph and the other defendants were jointly and severally liable for the damages that Marshall incurred.

22.      On November 12, 2009, the Illinois State Court entered a judgment in favor of Marshall and against Joseph and others on counts III, V, VI and VII of Marshall's Amended Complaint.

5

23.     On November 3, 2010, after three days of hearings on damages against certain defendants, but not Joseph, the Illinois State Court entered judgment in favor of Marshall and against those defendants in the amount of $23,887,032.63, which was later adjusted to $23,811,358.52.

24.     The Illinois State Court scheduled a damages hearing against Joseph for November 2011, but that hearing was postponed at Joseph's request due to an alleged health condition which Joseph asserted prevented him from testifying and travelling.   (*See* Illinois State Court February 16, 2012 Order.)

25.     As discussed in more detail below, Joseph filed for bankruptcy on the eve of the rescheduled February 2012 Illinois State Court hearing to fix damages against him.

26.     Joseph's bankruptcy filing prevented Marshall from fixing his claim against Joseph to a final judgment.

27.     After Joseph was eventually denied a discharge in bankruptcy, Marshall was able to return to the Illinois State Court to obtain a final judgment against Joseph.

28.     On November 15, 2016, the Illinois State Court entered a Final Judgment Order in favor of Marshall against Joseph Grasso in the amount of $23,712,718.52 (the "Judgment").

29.     On February 1, 2017, the Judgment was transferred to Montgomery County, Pennsylvania and docketed as case number 2017-02140.

30.     In the Fall of 2020, after Joseph's bankruptcy case was closed, Plaintiff initiated discovery in aid of execution on the Judgment.

31.     Through this discovery, Plaintiff has uncovered ample evidence of fraudulent transfers, asset hiding, and other fraud on Joseph's creditors.

32.     Joseph has never paid a penny to Plaintiff to pay down the Judgment.

### B.    JOSEPH GRASSO'S BANKRUPTCY

33.    In an attempt to avoid being subject to a judgment arising out of Marshall's claims in the State Court Action and the claims of his other creditors, on February 6, 2012, Joseph filed a voluntary petition for bankruptcy under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Bankruptcy Court").   This case was docketed as case 12-11063-mdc.

34.    Joseph has been and remains insolvent at all material times, both prior to and after filing his bankruptcy and until today.   *See* Ex. 6, Joseph Dep., p. 114:12-13 ("every one of my assets is gone now").

35.    Joseph made many material misrepresentations in connection with his bankruptcy, including, *inter alia*, reporting on Schedule B of that bankruptcy filing that he had no "Interest in IRA, ERISA, Koegh, or other pension or profit sharing plans."   *In re Grasso*, Bankruptcy Case No. 12–11063–MDC (Bankr. E.D. Pa.), D.E. 34, p. 2, ⁋ 12.

36.    Joseph's Schedule B also concealed and failed to disclose the existence of his SEP-IRA account (XXXXXXX3188) at Vanguard.

37.    Joseph's Schedule B further concealed and failed to disclose the existence of a joint account (XXXX1121) he held with his wife at Vanguard.

38.    On July 23, 2012, one of Joseph's other creditors filed a motion with the Bankruptcy Court requesting that Joseph's bankruptcy be converted to a chapter 7 proceeding based on Joseph's failure to file monthly operating reports and the required financial disclosures for various entities in which he held ownership interests.   *In re Grasso*, 490 B.R. 500, 504 (Bankr. E.D. Pa. 2013).

39.    The Bankruptcy Court held two hearings to address the motion to convert.   At the

close of these hearings, "it became apparent that [Joseph] was unwilling to investigate whether his wife's interests in the entireties property may be invalidated for the benefit of his estate." *In re Grasso*, 490 B.R. at 504.

40.     Shortly thereafter, a Motion to Appoint Trustee was filed with the Bankruptcy Court for the appointment of a Chapter 11 Trustee to operate or manage Joseph's Chapter 11 bankruptcy estate.   Marshall joined this Motion.   *In re Grasso*, 490 B.R. at 505.

41.     The Bankruptcy Court held a hearing on the Motion to Appoint a Trustee.   At the close of the hearing, the "Court made several factual findings including, *inter alia,* that (1) [Joseph] was dishonest in his testimony to this Court, (2) [Joseph] diverted estate assets, and (3) [Joseph] breached his fiduciary duty as a debtor-in-possession."   *In re Grasso*, 490 B.R. at 505.

42.     On October 16, 2012, the Bankruptcy Court issued an order directing the appointment of a Chapter 11 Trustee to oversee Joseph's bankruptcy estate.

43.     By Order dated June 12, 2013, the Bankruptcy Court converted Joseph's Chapter 11 bankruptcy case to a Chapter 7 bankruptcy proceeding.   *In re Grasso*, Bankruptcy Case No. 12–11063–MDC (Bankr. E.D. Pa.), D.E. 652.

44.     Christine C. Shubert (the "Trustee") was appointed as the Chapter 7 Trustee in Joseph's bankruptcy.

### 1.     The Trustee's Lawsuits

45.     Prior to and after Joseph's bankruptcy filing, Joseph and Donna deliberately undertook a scheme to hide and divert Joseph's assets, by, among other things, sending certain assets to an offshore entity he created located in The Bahamas.

46.     In light of Joseph's and Donna's wrongdoing, including hiding and diverting assets, the Trustee commenced three different adversary actions against Joseph and Donna:   Adversary

Proceeding No. 13-00635; Adversary Proceeding No. 14-00057; and Adversary Proceeding No. 14-00064 (collectively the "Adversary Actions").

47.     On December 13, 2013, the Trustee sued Joseph and Donna for various post-petition fraudulent transfers made for Joseph's benefit.  *Christine C. Shubert v. Joseph Grasso and Donna Grasso*, U.S.B.C. for the E.D. Pa., No. 13-00635, D.E. 1.   On March 27, 2014, the Trustee filed an Amended Complaint.  *Christine C. Shubert v. Joseph Grasso and Donna Grasso*, U.S.B.C. E.D. Pa., No. 13-00635, D.E. 16.

48.     In this first suit, the Trustee alleged, and Joseph and Donna, never contested that:

    a.   Joseph made or caused to be made approximately $488,494.09 in post-petition transfers from certain entities he owned in part and which comprised part of his bankruptcy estate, to pay for his and his family's personal expenses.  *Christine C. Shubert v. Joseph Grasso and Donna Grasso*, U.S.B.C. E.D. Pa., No. 13-00635, D.E. 16, ¶¶ 13, 19.

    b.   Those fraudulent transfers included: $263,835.77 that Joseph caused to be transferred in connection with the construction on the property at 649 Dodds Lane, Gladwyne, PA (the "Dodds Lane Property"); $50,000 that Joseph used to purchase a Hummer vehicle; and, $81,056.28 in payments of personal expenses for himself and Donna.  *See Id.*, ¶ 17.

49.     To conceal his improper transfers, Joseph diverted funds through three entities he controlled: JGKM Associates, LLC, WSC Commercial Real Estate Management, LLC, and Curtis Investors, LP.   On June 26, 2014, the Bankruptcy Court entered a judgment in favor of the Trustee and against Joseph and Donna on the Trustee's Amended Complaint. *Christine C. Shubert v. Joseph Grasso and Donna Grasso*, U.S.B.C. E.D. Pa., No. 13-00635, D.E. 35.

50.     On February 5, 2014, the Trustee filed a second suit against Joseph, Donna and 649 Family Partnership, LLC for fraudulently transferring $175,000.00 for Joseph's benefit pre-petition on May 2, 2011.   *Christine C. Shubert v. Joseph Grasso and Donna Grasso* Donna and 649 Family Partnership, LLC, U.S.B.C. E.D. Pa., No. 14-00057, D.E. 1.   649 Family Partnership, LLC was an offshore entity created by Joseph in The Bahamas to hide a portion of the money which would have otherwise been used to satisfy his debts owed to his creditors.

51.     On June 26, 2014, the Bankruptcy Court entered a judgment in favor of the Trustee and against Joseph, Donna and 649 Family Partnership on the Trustee's Complaint. *Christine C. Shubert v. Joseph Grasso and Donna Grasso and 649 Family Partnership, LLC*, U.S.B.C. for the E.D. Pa., No. 14-00057, D.E. 17.

52.     On February 5, 2014, the Trustee filed a third suit against Joseph and Donna for fraudulently transferring $117,000.00 for Joseph's benefit pre-petition between September 2009 and February 2010.   *Christine C. Shubert v. Joseph Grasso and Donna Grasso*, U.S.B.C. E.D. Pa., No. 14-00064, D.E. 1.

53.     On June 26, 2014, the Bankruptcy Court entered a judgment in favor of the Trustee and against Joseph and Donna on the Trustee's Complaint. *Christine C. Shubert v. Joseph Grasso and Donna Grasso*, U.S.B.C. for the E.D. Pa., No. 14-00064, D.E. 17.

54.     The Trustee's three judgments against Joseph and Donna in connection with the Adversary Actions totaled $780,494.09 (the "J&D Judgments").

55.     On January 8, 2015, the Trustee transferred the J&D Judgments to the Court of Common Pleas for Montgomery County, Pennsylvania.   These judgments were docketed as case numbers 2015-00404 and 2015-00406.

56.     As a result of Joseph's lying, diversion of assets and other intentional wrongdoing,

on September 15, 2015, the Bankruptcy Court entered an order denying Joseph a discharge from bankruptcy.   *In re Grasso*, 537 B.R. 216 (Bankr. E.D. Pa. 2015), *affirmed*, 562 B.R. 877 (E.D. Pa, 2016) (Rufe, J.).

57.    Among the Bankruptcy Court's factual determinations in denying Joseph a discharge, the court found that Joseph:

1.    conducted "an intentional scheme to obscure from this Court and his creditors the nature of his finances;"

2.    "lied to this Court and his creditors about his purchase of" certain assets;

3.    wrongly diverted assets worth hundreds of thousands of dollars that rightfully belonged to his bankruptcy estate;

4.    wrongly caused distributions totaling $156,758.35 to be either made for his own benefit to non-debtor entities or diverted by him to the operating accounts of non-debtor entities that he controlled; and,

5.    "purposely hid his diversion of estate assets."

*See In re Grasso*, 537 B.R. 219-20.

58.    On July 26, 2016, this Court affirmed the Bankruptcy Court's order denying Joseph a discharge from bankruptcy.   *In re Grasso*, 562 B.R. 877 (E.D. Pa, 2016) (Rufe, J.).

59.    As a consequence of the Bankruptcy Court's order denying a discharge, Joseph remains personally liable for his prepetition liabilities, including the Judgment.

**2.    The Trustee's Discovery in Aid of Execution**

60.    On October 31, 2016, the Trustee took Joseph's and Donna's depositions in aid of execution on the J&D Judgments.

61.    Joseph and Donna both lied and otherwise concealed Joseph's assets during these October 31, 2016 depositions and in connection with the Trustee's other discovery in aid of execution on the J&D Judgments.

11

62.     For example, Joseph lied about not having any current interest in any retirement account.   Ex. 5, Joseph Oct. 31, 2016 Dep., p. 30:2-5; Ex. 6, Joseph Dep., p. 304:12-21.

63.     In reality, he had approximately $100,000 in his retirement account at the time. *See* Ex. 57 (KATZ-304), p. 2.

64.     Joseph also lied about who he worked for.   He claimed he "worked for my father." *See* Ex. 5, Joseph Oct. 31, 2016 Dep., pp. 18:1-5, 30:6-31:1.

65.     Joseph failed to disclose that in 2015 and 2016, his "primary job was working for Iron Hill."   Ex. 6, Joseph Dep., 275:16-19.   He also concealed and failed to disclose to the Trustee the existence of Iron Hill at all or that he served as Iron Hill's President, Treasurer and Secretary.

66.     Donna lied under oath during her October 31, 2016 deposition by, *inter alia*, failing to disclose to the Trustee the existence of any Vanguard account.   Specifically, she denied owning any stocks or having any bank accounts other than one at Beneficial Bank.   Ex. 2, Donna Oct. 31, 2016 Dep., pp. 13:12-16, 15:3-7).

67.     In reality, she had approximately $20,000 in an account titled in the name of both her and her husband at Vanguard.   *See* Ex. 56 (KATZ-303), p. 2.

68.     After misleading the Trustee about their assets, on July 12, 2017, Joseph and Donna entered into a settlement agreement to resolve the Trustee's claims related to the J&D Judgments. *In re Grasso*, Bankruptcy Case No. 12–11063–MDC (Bankr. E.D. Pa.), D.E. 1782-1.

69.     On August 22, 2017, the Bankruptcy Court granted the Trustee's Motion to approve the settlement with Joseph and Donna.   *In re Grasso*, Bankruptcy Case No. 12–11063–MDC (Bankr. E.D. Pa.), D.E. 1786.

70.     However, the approval order specifically carved out from the release any creditors' claim, including Marshall's claims, against Joseph and Donna:

> The Settlement Agreement and Release does not release any claim of any of the Debtor's creditors, and it does not prevent any of the Debtor's creditors (other than Christine C. Shubert as Chapter 7 Trustee) from exercising their legal remedies (including, for those creditors with judgments, collecting upon or attaching assets) as they apply to asset of the Debtor from (or in the control of) any of the following individuals or entitles listed in paragraph 4 of the Settlement Agreement and Release: the Defendants (Joseph and Donna Grasso) and each of their respective parents, subsidiaries, affiliates, officers, directors, agents, sureties, insurers, directors, successors, assigned (and their affiliates, officers, directors, agents, sureties, insurers, directors, successors and assigned).

*In re Grasso*, Bankruptcy Case No. 12–11063–MDC (Bankr. E.D. Pa.), D.E. 1786.

71.     On September 24, 2020 – more than eight years after Joseph filed for bankruptcy, the Bankruptcy Court finally entered an order closing Joseph's bankruptcy.

## C.     DEFENDANTS IRON HILL AND LOUDERBACK SERVE AS JOSEPH GRASSO'S ALTER EGOS AND CONCEAL HIS FRAUDULENT TRANSFERS

72.     Joseph caused Iron Hill and Louderback to be created as artifices to serve as his alter ego and conceal and attempt to shield his assets from his creditors.

73.     Joseph used, and continues to use, Iron Hill and Louderback to shield his assets from his creditors or to act as his alter ego.

74.     At all material times since 2015, each of the Defendants knew or should have known, that Joseph owed substantial debts to Joseph's creditors.

75.     At all material times since 2015, each of the Defendants knew or should have known, that Joseph's creditors had sued or were threatening to sue Joseph.

76.     At all material times, each of the Defendants knew, or should have known, of the substantial judgments and claims in favor of Joseph's creditors.

77.     At all material times, Iron Hill, Louderback, Melissa, Joe Jr., Michael, Amanda, Nicholas and Kaplan agreed to act as a conduit for Joseph's assets for purposes of hindering, delaying and defrauding Joseph's creditors.

13

1.  **Joseph Forms Iron Hill to Shield His Assets**

78.     Joseph controls Iron Hill, a company he founded in the summer of 2015 and for which he serves as President.

79.     As discussed in more detail below, since at least 2015, Iron Hill served as an artifice to remove or conceal Joseph's assets.

80.     Joseph has actual control over Iron Hill, as its sole officer and its President, Treasurer and Secretary from its founding to date.   Ex. 7, Melissa Dep., pp. 43:24-44:2, 75:4-16.

81.     In furtherance of the conspiracy, Joseph, Melissa and others agreed that Melissa would be listed as the sole owner of Iron Hill.

82.     In reality, Melissa had no control or involvement with Iron Hill.   Ex. 7, Melissa Dep., pp. 50:5-16 ("I did not have anything to do with daily operations."), 65:11-12.

83.     She put up no money to start or operate the company and has no idea who provided financing to incorporate Iron Hill.   Ex. 7, Melissa Dep., pp. 68:3-11, 79:2-6.

84.     She did not review the company finances or even get regular information on how Iron Hill was doing.   Ex. 7, Melissa Dep., p. 51:18-23.

85.     Melissa admits that she has never discussed business with Joseph.   Ex. 7, Melissa Dep., pp. 28:12-13, 98:16-21, 105:20-23 ("Q. … did you ever have a meeting with your father at any point in time to discuss Iron Hill's business?   A. No.").

86.     Thus, despite Melissa's nominal ownership of Iron Hill, Joseph has actual and complete control over Iron Hill.   Ex. 7, Melissa Dep., pp. 43:24-44:2 (My father "runs Louderback or Iron Hill, now Louderback.").

2. **Louderback Formed to Further Insulated Joseph's Assets**

87.     Joseph caused Louderback to be formed on November 10, 2020 as a way to further hinder, delay and defraud his creditors.

88.     Since at least November 2020, Louderback has served as an artifice to remove or conceal Joseph's assets.

89.     With his bankruptcy dismissed just six weeks earlier without obtaining a discharge, Joseph faced the real possibility that his bankruptcy creditors would commence discovery in aid of execution proceedings against him.

90.     The risk of execution proceedings against Iron Hill was particularly real, as even though his control over Iron Hill was concealed by Melissa's purported ownership, Joseph served as Iron Hill's sole officer and exercised complete control over Iron Hill's operation, which he directed for his sole benefit.

91.     Accordingly, he decided to structure a new entity, Louderback, as a limited liability company, to further hinder, delay and defraud his creditors by placing additional layers and barriers between his assets and his creditors.

92.     To further obscure his actual control of Louderback, Joseph decided that his five Defendant children would be nominal owners of Louderback with Kaplan to serve as the managing member.

93.     However, in reality, and like Iron Hill, Joseph manages and retained complete control of Louderback and operate it for his sole benefit.   *See* Ex. 29 (KATZ-203).

94.     Louderback's website describes Joseph as Louderback's founder.   Ex. 29 (KATZ-203); Ex. 6, Joseph Dep., pp. 164:9-165:12.   Similarly, Kaplan described Joseph as Louderback's "Guiding light and inspiration."   Ex. 1, Kaplan Dep., p. 43:18-19.

95.    Joseph acts on Louderback's behalf and effectively controls the business, despite the fact that his children and Kaplan are identified as the owners of the entity.   *See* Ex. 1, Kaplan Dep., p. 188:10-12.

96.    Joseph personally manages the Louderback team. Ex. 29 (KATZ-203): Ex. 6, Joseph Dep., p. 167:3-19.   He is also the driving force behind its growth and operations.   *Id*.

97.    Joseph retains all the power and authority he had as the President of Iron Hill, while avoiding being named as an officer of Louderback to try to establish the appearance of distance between himself and Louderback.

98.    Joseph approached Melissa about founding Louderback.   Ex. 7, Melissa Dep., p. 120:18-20.

99.    Joseph decided that Kaplan should have a 1% interest in Louderback.   Ex. 1, Kaplan Dep., p. 75:11-19.

100.    Neither Kaplan nor any of Joseph's children made any capital contribution for their interest in Louderback.   Ex. 7, Melissa Dep., p. 122:7-11; Ex. 28 (KATZ-202), p. RUSSO000119.

101.    Iron Hill's annual revenue in both 2019 and 2020 exceeded $8 million.   Ex. 20 (KATZ-109); Ex. 38 (KATZ-227).

**3.    Iron Hill and Louderback Serve as Joseph's Alter Ego**

102.    Joseph has the power to hire or fire any Iron Hill or Louderback employees.   *See* Ex. 6, Joseph Dep., pp. 129:21-130:3.

103.    To avoid his creditors, Joseph did not draw a salary from Iron Hill.   Instead, he had Iron Hill "reimburse[] [him] for living and travel expenses" (Ex. 9 (KATZ-8a), ¶ 31), so that he could lead a lavish lifestyle without exposing his money to the reach of his creditors.

104.    Joseph has even had Iron Hill and Louderback pay his personal expenses including

those owed to Mitts Law, LLC for his personal legal bills arising from Plaintiff's judgment collection efforts.   *See* Ex. 31 (Katz-205); Ex. 35 (KATZ-215), p. 113; Ex. 6, Joseph Dep., pp. 37:9-41:23.

105.   Joseph not only has Iron Hill pay his expenses, but it also pays Donna's personal expenses.   *See*, *e.g*., Ex. 4, Donna Dep., pp. 353:15-356:15.

106.   Joseph thereby fraudulently transferred his funds for the benefit of Donna by having it pay her personal bills directly.

### a.   Iron Hill/Louderback Serve as Joseph's Piggy Bank

107.   Iron Hill and Louderback are essentially Joseph's piggy bank to use as he sees fit.

108.   At all material points in time, Joseph exercised control over Iron Hill and Louderback's funds and used these funds for his personal benefit and thereby directing the transfer of hundreds of thousands of dollars to cover his lifestyle.

109.   Since their founding, Joseph has had Iron Hill and Louderback make payments and/or distributions to, for his own benefit of, or at his request.

110.   In his 2020 tax return, Joseph disclosed $287,953 in income from Iron Hill/Louderback.   Ex. 55 (KATZ-289), p. GRASSO005573; Ex. 1, Kaplan Dep., p. 158:1-10.   Of course, this figure does not include all the additional compensation he received, but failed to report. *See, e.g*., Ex. 1, Kaplan Dep., p. 168:17-24.

111.   Joseph admits that he could get all of Iron Hill or Louderback's money if he wanted. Ex. 6, Joseph Dep., p. 322:10-14.

112.   Joseph further admitted "I'd say I need money, I'm broke.  I'm working here, I need money.   So, they would cut a check once in a while."   Ex. 6, Joseph Dep., p. 325:12-14.

113.     Joseph also has caused Iron Hill to make various "loans" to him, by which Iron Hills simply pays certain funds on Joseph's behalf to third parties.   *See* Ex. 35 (KATZ-215), p. 113.   Joseph, of course, did not pay back these loans.

114.     Joseph admitted that he uses credit and debit cards provided by Iron Hill or Louderback to pay his personal bills.   Ex. 6, Joseph Dep., p. 33:13-18; Ex. 1, Kaplan Dep., p. 248:15-22 (Joseph "used the company debit card for his living expenses.").

115.     Joseph used and continues to use the company debit cards for personal uses, both before and after Katz had a Writ of Execution served on March 31, 2021.   Ex. 1, Kaplan Dep., p. 145:12-22; Ex. 6, Joseph Dep., p. 55:13-15.

116.     Joseph testified that all five of his children allow him to use Louderback's credit and debit cards for personal use.   Ex. 6, Joseph Dep., pp. 60:10-19, 62:6-11.

117.     Examples of Joseph's personal purchases using Iron Hill or Louderback debit cards, include, but are in no way limited to:

a.   Haircuts (Ex. 33 (KATZ-210), p. CB00014.07, Ex. 42 (KATZ-235), p. CB00039.02);

b.   $3,532.57 birthday dinner for his wife and thousands, if not tens of thousands, of dollars for other regular dining excursions (Ex. 6, Joseph Dep., pp. 62:6-24, 87:13-23; Ex. 33 (KATZ-210), p. CB00099.03);

c.   Grocery and food deliveries, including InstaCart (Ex. 6, Joseph Dep., p. 63:2-8; Ex. 42 (KATZ-235), p. CB00036.03);

d.   Indoor rock-climbing outings (Ex. 42 (KATZ-235), p. CB00036.03);

e.   Massages at Hand & Stone (Ex. 6, Joseph Dep., p. 76:3-8, Ex. 42 (KATZ-235), pp. CB00037.03, CB99938.03);

f.   Dog food (Ex. 33 (KATZ-210), p. CB00098.05);

g.   Children's clothes (Ex. 41 (KATZ-234), pp. CB00265.04, CB00265.05);

h.   Contact lenses (Ex. 6, Joseph Dep., pp. 64:2-65:9);

i.   Retaining a company called Credit Saint to repair Joseph's personal credit (Ex. 6, Joseph Dep., p. 76:19-77:4);

j.   Peloton monthly subscription (Ex. 42 (KATZ-235), pp. CB00037.02, CB00037.03);

k.   Boat rental (Ex. 42 (KATZ-235), p. CB00035.02);

l.   Zinman Furs (Ex. 42 (KATZ-235), p. CB00037.03);

m.   Doctors' appointments and medical bills (Ex. 33 (KATZ-210), p. CB00099.02; Ex. 42 (KATZ-235), p. CB00038.02; Ex. 6, Joseph Dep., p. 330:10-13);

n.   PayPal transactions.   (Ex. 6, Joseph Dep., pp. 55:22-56:5; Ex. 33 (KATZ-210); Ex. 42 (KATZ-235) (Joseph makes personal PayPal charges that are deducted straight from Iron Hill and Louderback's bank accounts); Ex. 1, Kaplan Dep., pp. 143:21-144:23);

o.   Venmo transactions.   Ex. 33 (KATZ-210); Ex. 42 (KATZ-235) (Joseph makes personal Venmo charges that are deducted straight from Iron Hill and Louderback's bank accounts.   Ex. 1, Kaplan Dep., p. 146:2-16; Ex. 6, Joseph Dep., p. 71:10-22); and,

p.   Amazon transactions.   Ex. 6, Joseph Dep., pp. 58:24-59:14; Ex. 33 (KATZ-210); Ex. 42 (KATZ-235).

118.   Iron Hill and Louderback's bank statements reflect such a comprehensive intermingling of both Joseph's personal charges and charges for business purposes that even Joseph could not determine which transactions were for business purposes and which were personal charges.   *See*, *e.g.*, Ex. 33 (KATZ-210); Ex. 42 (KATZ-235); Ex. 6, Joseph Dep., pp. 66:22-67:23, 73:7-22.

119.    To conceal his use personal use of company funds, Joseph also routes his personal transactions, which are paid for by Iron Hill or Louderback, through his wife's online accounts, for a mix of both personal and business charges:

> We [my businesses] don't have a Pay Pal account, so if I have to purchase something on eBay pertaining to a job, I go through my wife's Pay Pal account, which I've been doing for the last ten years or more and that's – the Pay Pay account is tied to her – to the eBay account.

Ex. 6, Joseph Dep., pp. 80:21-81:3.

120.    Joseph has never been asked to repay any personal expense he incurred using Iron Hill or Louderbacks's accounts.   Ex. 1, Kaplan Dep., p. 157:15-18.

121.    By way of Joseph's further use of Iron Hill and Louderback's accounts for his own personal use,

- In May of 2019, Joseph had Iron Hill pay $20,000.00 for his rental of a shore house. Ex. 46 (KATZ-255); Ex. 6, Joseph Dep., pp. 100:15-101:6; and,

- In 2019 and 2020, Joseph had Iron Hill issue at least two separate rent check of $21,000.00 each to the landlord for his personal residence.   Ex. 21 (KATZ-119); Ex. 22 (KATZ-120); Ex. 6, Joseph Dep., pp. 92:23-93:21.

122.    As discussed in more detail below, Joseph abused Iron Hill and Louderback's corporate form for other personal transactions.

### b.    Muirfield Property Purchase

123.    In early 2020, Joseph wanted to purchase a new home for his personal use.   In particular, he was interested in purchasing the property at 817 Muirfield Road, Bryn Mawr, Pennsylvania ("Muirfield Property").

124.    Because Joseph maintained no accounts or other assets in his own name, to facilitate his purchase of a home, on January 2, 2020, he had Iron Hill issue check number 6448 to

Fox Roach L.P. in the amount of $100,000 as a down payment for a house.   Ex. 43 (KATZ-237); Ex. 1, Kaplan Dep., pp. 250:9-251:7.

125.     On or about February 18, 2020, Joseph signed an Agreement for the Sale of Real Estate on behalf of GF 2014 to purchase the Muirfield Property.   Ex. 16 (KATZ-74).   No one else signed the Agreement for Sale on behalf of the buyer.

126.     Joseph also signed at least three addendums to the original Agreement for the Sale of Real Estate: February 18, 2020, February 25, 2020; and March 3, 2020.   Exs. 17 (KATZ-79), 18 (KATZ-80), 19 (KATZ-81).

127.     In April 2020, when the deal for the purchase of the Muirfield Property failed to close and the sellers threatened to bring an action against GF 2014 for $200,000 held in escrow, Joseph hired Mitts Law, LLC to defend against the action.   Ex. 6, Joseph Dep., pp. 326:21-327:9.

128.     However, Joseph had Iron Hill pay Mitts Law, LLC to defend GF 2014.   *See*, *e.g.*, Ex. 35 (KATZ-215), pp. 76, 81 (GRASSO09005385, 90).   Joseph called this another "favor" that Iron Hill was doing for him.   Ex. 6, Joseph Dep., pp. 327:10-328:9.

### c.     Dodds Lane Property

129.     Joseph also used funds from the Iron Hill account to improve the Dodds Lane Property.   *See*, *e.g.*, Ex. 34 (KATZ-214), pp. 4, 6, 9, 16 (Iron Hill's check register showing multiple payments to Home Depot for "Joe's House"), pp. 44, 65 (Iron Hill checks to JM Lopez for Drywall for "Joe's House").

### d.     Other Personal Uses

130.     Joseph used Iron Hill/Louderback for personal payments to other family member Defendants and for other personal uses.

131.     Joseph uses Iron Hill/Louderback to provide large cash Christmas gifts to his children.   Ex. 6, Joseph Dep., pp. 146:23-147:1, 148:15-18.

132.     In 2017, 2019 and 2020, Joe Jr., Melissa, Amanda and Michael each received checks in the amount of $5,000, while Nicholas received $2,500.   The 2017 and 2019 checks were written on Iron Hill's checks, while the 2020 checks were written on Louderback's checks.   Ex. 34 (KATZ-214), pp. 82-83; Ex. 35 (KATZ-215), pp. 111-12; Ex. 36 (KATZ-217a), p. 10.

133.     Upon information and belief, this practice continued in 2018 and 2021, but neither Joseph, Iron Hill nor Louderback produced the records needed to verify that these annual payments were made.

134.     Joseph has also caused Iron Hill to pay various expenses of Joe Jr. incurred in connection with his personal residence.   *See. e.g.*, Ex. 34 (KATZ-214), pp. 17, 49, 52, 58, 59. 62. 65. 71; Ex. 35 (KATZ-215), pp. 8, 9, 67, 69.

135.     On March 16, 2021, when Amanda and her husband, Defendant Andres Papadopoulus, needed money in connection with their 2020 purchase of a new home at 418 Conshohocken State Road, Joseph had Louderback wire $10,000.00 to Bryn Mawr Trust Company for the purchase.   Ex. 39 (KATZ-229).

136.     Joseph had Iron Hill pay when his father's car needed to be towed.   Ex. 34 (KATZ-214), p. 59.

137.     Joseph used Iron Hill/Louderback to make payments on behalf of other entities he owns and controls, even, if not titled in his own name.   For example:

- When Joseph's bowling alley in Downingtown, Pennsylvania needed money to pay the rent, Joseph had Iron Hill make the $8,500 rent payment.   Ex. 1, Kaplan Dep., pp. 237:4-238:10; Ex. 35 (KATZ-215), p. 79; Ex. 6, Joseph Dep., p. 334:4-

14.   In 2019 and 2020, when Joseph was creating a new nightclub, "The Ave," he had Iron Hill make a large variety of payments on his behalf to and for The Ave, including, but not limited to, (a) paying a retainer to Edward A. Taraskus, PC for the transfer of a liquor license, (b) paying Joseph's capital contribution, and (c) advancing or paying salaries for The Ave's managers. Exs. 23 (KATZ-173), 24 (KATZ-174), 26 (KATZ-189).

138.   Iron Hill/Louderback did not own either the bowling alley or The Ave.  Ex. 6, Joseph Dep., p. 335:5-10.

139.   Like with Iron Hill, Joseph had Melissa serve as the straw owner on The Ave on paper.

140.   However, one of The Ave's partners properly described Joseph as his partner in this deal.  Ex. 25 (Katz-180).

e.   **Montgomery County Writ of Execution Ignored**

141.   On March 31, 2021, the Montgomery County Sheriff personally served Kaplan with a Writ of Execution directed to Louderback.  Ex 59 (KATZ-330); Ex. 1, Kaplan Dep., p. 177:8-19.

142.   Iron Hill and Louderback's payments of Joseph's personal expense did not stop after the Sheriff served the Writ of Execution.

143.   In fact, even after consulting with counsel, Kaplan took no action to obey the Writ after it was served.  Ex. 1, Kaplan Dep., pp. 179:15-180:1.

144.   Nearly two months after the Writ was served, Joseph and Kaplan decided to add Joseph as an "employee" on Louderback's payroll.  Ex. 1, Kaplan Dep., p. 183:11-22.

145.     Joseph only started drawing a salary from Louderback at the end of May 2021, after consulting with counsel about how to avoid Writ.   *See* Ex. 6, Joseph Dep., pp. 47:22-48:23.

146.     Joseph continues to perform the same roles and duties on behalf of Louderback that he performed before he was designated an "employee."   The only difference being that he now "drew" a salary.   Ex. 1, Kaplan Dep., pp. 185:23-186:6.

147.     Joseph and Kaplan designated Joseph as an employee in an attempt to avoid the Writ.

148.     Joseph continues to have and to use Iron Hill and/or Louderback debit cards for personal use, which cards Iron Hill and Louderback continue to pay.   Ex. 1, Kaplan Dep., p. 180:11-22.

    4.     **Louderback is Iron Hill's Successor in Interest**

149.     To the extent, if any, that Louderback is a distinct entry separate and apart from Iron Hill, Louderback is Iron Hill's Successor in Interest.

150.     Joseph admitted that Louderback is Iron Hill's Successor in Interest: "I always had the impression that Louderback is a successor of Iron Hill."   Ex. 6, Joseph Dep., p. 164:4-6.

151.     Joseph further testified that:

- "… there's no customer of mine that's stuck on the fact that one company over another company.   It's the same people.   We have this – we have the same employees and the same people working on the jobs."   Ex. 6, Joseph Dep., p. 163:11-16.

- "If it was **Iron Hill or Louderback, it was the same thing**."   Ex. 6, Joseph Dep., p. 271:11-12 (emphasis added).

- "If it says Louderback on it, to me **they're the same entity**. It's just that we

couldn't leave – **it's a name change to me**."   Ex. 6, Joseph Dep., p. 271:15-17 (emphasis added).

152.    Louderback held itself out to the public as Iron Hill's successor in interest or merely a continuation of Iron Hill's business.   Indeed, Louderback placed a sign on the front door of its office building stating: "The Louderback Group, LLC (formerly) Iron Hill Company."   Ex. Ex. 32 (KATZ-207); Ex. 6, Joseph Dep., p. 131:22-132:1.

153.    After Louderback was formed in November 2020, Joseph caused millions of dollars to be transferred from Iron Hill's account number (XXXXXX-910-9) to Louderback's account number (XXXXXX-115-8), including, but not limited to:

| Date | Amount |
|---|---|
| November 10, 2020 | $1,000.00 |
| November 19, 2020 | $654,579.96 |
| December 2, 2020 | $250,000.00 |
| December 17, 2020 | $633,882.11 |
| January 28, 2021 | $551,128.63 |
| February 10, 2021 | $134,861.40 |
| February 23, 2021 | $105,286.29 |
| March 2, 2021 | $69,359.20 |
| March 16, 2021 | $90,927.63 |
| April 5, 2021 | $57,715.57 |
|  | $134,381.25 |
| April 26, 2021 | $100,068.75 |
| April 27, 2021 | $163,334.60 |
| May 17, 2021 | $360,030.00 |
| May 19, 2021 | $60,955.05 |
| May 21, 2021 | $140,000.00 |
| June 15, 2021 | $43,789.50 |
| June 29, 2021 | $399,925.10 |

Exs. 33 (KATZ-210), 41 (KATZ-234), 42 (KATZ-235).

154.    Louderback's logo is the same as Iron Hill's logo, but with different coloring.   Ex. 32 (KATZ-207); Ex. 6, Joseph Dep., p. 131:18-21.

155.    Louderback's Website says it is copyrighted by Iron Hill.   Ex. 30 (KATZ-204).

156.    Iron Hill paid to form Louderback and provided the entity's capitalization.

157.    On August 13, 2020, Iron Hill applied for the trademark "The Louderback Group." Ex. 27 (KATZ-201).

158.    Joseph came up with the name "The Louderback Group."   Ex. 6, Joseph Dep., p. 126:20-22.

159.    Before Louderback was even formed, Iron Hill hired and paid Mitts Law, LLC for its work to trademark "The Louderback Group."   *See* Ex. 31 (KATZ-205); Ex. 35 (KATZ-215), p. 113; Ex. 6, Joseph Dep., pp. 125:4-126:17.   Thus, Iron Hill owns Louderback's trademark.

160.    On March 17, 2021, Louderback represented to the Court of Common Pleas of Philadelphia County that it was the successor in interest to Iron Hill, when Louderback filed a Motion to Quash Plaintiff's discovery in aid of execution.   Ex. 52, *Katz v. Grasso*, Philadelphia CCP, January Term, 2021, No. 00616, Motion to Quash Subpoena by Non-Parties The Louderback Group f/k/a Iron Hill Company and Donna Grasso.

161.    Iron Hill funded Louderback's operations.

162.    Iron Hill and Louderback both operate out of the same space at the 579 E. Lafayette Street, Norristown office.   Ex. 6, Joseph Dep., p. 128:4-9.

163.    Louderback pays for the 579 E. Lafayette Street, Norristown office rent, although the lease is in Iron Hill's name.   Ex. 6, Joseph Dep., p. 132:2-7; Ex. 13 (KATZ-68a).

164.    Iron Hill and Louderback's offices have the same furniture.   Ex. 6, Joseph Dep., p. 141:7-9.

165.    Iron Hill and Louderback have the same employees.   Ex. 6, Joseph Dep., p. 128:10-13.

166.    Currently, Iron Hill does not have any employees, as "[e]veryone has been

[employed] through Louderback."   Ex. 1, Kaplan Dep., p. 244:15-17.

167.    Joseph performs the same job functions for Louderback that he performed for Iron Hill.   Ex. 6, Joseph Dep., p. 158:5-7.

168.    Iron Hill and Louderback have the same telephone number:   215-701-1000. Ex. 1, Kaplan Dep., p. 251:19-24; Ex. 6, Joseph Dep., p. 133:6-10.   Indeed, Joseph has used this telephone number as the main number for his businesses since prior to 2012 bankruptcy filing. *See* Ex. 6, Joseph Dep., p. 133:6-21.

169.    Iron Hill and Louderback are both in the construction business.

170.    Iron Hill and Louderback service the same clients and jobs performed by Iron Hill are identified on Louderback's website as Louderback projects.

171.    Iron Hill will shut down as soon as the final construction contract under Iron Hill's name is completed.   The final construction project under Iron Hill's name is located in New York City and getting the permits switched to Louderback's name was too complicated, so it remains in Iron Hill's name.   Ex. 1, Kaplan Dep., pp. 242:20-243:14.

172.    Despite being formed in November 2020, Louderback asserts that it "has been serving as a leading Construction Company in the Mid-Atlantic since our inception in 2013."   Ex. 30 (KATZ-204).

173.    Iron Hill and Louderback used a single set of financial books and records.   By way of example, Iron Hill's Trial Balance and General Ledger includes Louderback's bank accounts and expenses.   Ex. 38 (KATZ-227) and Ex. 37 (KATZ-220).

174.    By way of further example, in December 2020, Joseph caused multiple $5,000 Christmas checks payable to his children to be drawn on Louderback's bank accounts, but recorded as "Office Expenses" on Iron Hill's General Ledger.    *See* Ex. 35 (KATZ-215), p. 112

(GRASSO005422); Ex. 37 (KATZ-220), p. 287 (GRASSO005208); Ex. 40 (KATZ-230).

175.    Iron Hill does not issue 1099's to Joseph's children for these payments since they are viewed as "gifts."   Ex. 1, Kaplan Dep., p. 254:1-6; Ex. 10 (KATZ-10), ¶ 13.   Nevertheless, Iron Hill tax deducts these "gifts" to Joseph's children as a business expense.   Ex. 1, Kaplan Dep., p. 254:6-9.

176.    Louderback uses Iron Hill's tools and machinery.   Ex. 1, Kaplan Dep., p. 246:6-8.

177.    In the Fall of 2020, Iron Hill employees stopped using Iron Hill email addresses and started using Louderback email addresses in support of its business operations.   Ex. 1, Kaplan Dep., pp. 64:23-65:2.   In fact, Iron Hill employees, including Kaplan, started to use a Louderback email address *before* Louderback was even formed.   *See* Ex. 15 (KATZ-70).

178.    Iron Hill and Louderback business insurance coverage came through a single insurance policy.   Ex. 1, Kaplan Dep., pp. 66:23-67:3.

179.    Contracts entered into before the name change are under Iron Hill, but all new contracts are under the Louderback name.   Ex. 1, Kaplan Dep., pp. 66:14-23.

180.    The bank accounts of the operating business "changes from Iron Hill to Louderback."   Ex. 1, Kaplan Dep., p. 131:10-13.

181.    Louderback's checks are reflected on Iron Hill's financial journals.   In fact, in 2020 and 2021 Londerback did not have its own cash disbursements' journal, but instead used Iron Hill's cash disbursement's journal.   Ex. 1, Kaplan Dep., p. 90:4-8.

182.    Customer payments wired to Iron Hill's bank accounts are promptly transferred to Louderback's Bank account.   *Compare* Ex. 42 (KATZ-235) *with* Ex. 33 (KATZ-210).

183.    Louderback does not have a president, a secretary or a treasurer.   Ex. 1, Kaplan Dep., p. 71:23-4.

184.     Joseph approves all salaries for Louderback.   Ex. 1, Kaplan Dep., pp. 60:21-61:12

185.     Louderback pays for Joseph's Mercedes that is leased by Iron Hill.   Ex. 1, Kaplan Dep., pp. 130:12-131:13, 141:15-20.

186.     Louderback's website describes Joseph as Louderback's founder.   Ex. 29 (KATZ-203); Ex. 6, Joseph Dep., p. 164:9-165:12.   Similarly, Kaplan described Joseph as Louderback's "Guiding light and inspiration."   Ex. 1, Kaplan Dep., p. 43:18-19.

187.     Joseph acts on Louderback's behalf and effectively controls the business, despite the fact that his children and Kaplan are identified as the owners of the entity.   *See* Ex. 1, Kaplan Dep., p. 188:10-12.

188.     Joseph personally manages the Louderback team. Ex. 29 (KATZ-203): Ex. 6, Joseph Dep., p. 167:3-19.   He is also the driving force behind its growth and operations.   *Id.*

189.     Since at least November 2020, Louderback has served as an artifice to remove or conceal Joseph's assets.   Ex. 1, Kaplan Dep., p. 248:15-22 (Joseph "used the company debit card for his living expenses.").

190.     Joseph testified that all five of his children allow him to use Louderback's credit and debit cards for personal used.   Ex. 6, Joseph Dep., pp. 60:10-19, 62:6-11.

**D.     JOSEPH FRAUDULENTLY TRANSFERRED ASSETS TO DONNA, MELISSA AND IRON HILL**

191.     Since at least 2014 to date, Joseph maintained no bank accounts in his own name as part of his on-going scheme to avoid his creditors.   *See* Ex. 6, Joseph Dep., pp. 254:3-7, 313:4-7.

192.     Rather, he used Donna, Melissa, Iron Hill and Louderback's bank accounts to fund his own personal spending and to conceal his assets from his creditors. *See*, *e.g*., Ex. 6, Joseph Dep., p. 325:12-14.

193.    Moreover, to the extent that he received payments due him, he deposited those checks and other payments into Donna's, Melissa's, or Iron Hill's accounts and held those funds in those accounts until he needed to access them.    *See, e.g.*, Ex. 58 (KATZ-318), pp. WSFS 000858, 869; Ex. 47 (KATZ-265), pp. WSFS 0000791, 820, and Ex. 44 (KATZ-245), pp. WSFS 002390, 2392, 2434.

### 1.    Joseph Concealed his Vanguard Accounts

194.    Joseph hid over $175,000 in assets held at Vanguard from his creditors, including the Trustee.

195.    After the Bankruptcy Court approved Joseph and Donna's settlement of the J&D Judgments with the Trustee, Joseph "realized" he had both a retirement account and an investment account at Vanguard with large sums of money in them.   Ex. 6, Joseph Dep., p. 297:14-23.

196.    After "realiz[ing]" he had $175,000 he had purportedly forgotten about prior to his settlement with the Trustee, in January 2018, Joseph caused Vanguard to issue two checks payable to him personally: check number 24820423 in the amount of $7,429.41 and check number 24822241 in the amount of $135,713.79.   Ex. 47 (KATZ-265), pp. WSFS 000802-03; Ex. 6, Joseph Dep., pp. 309:17-310:4, 311:11-312:20.

197.    When Katz finally got the opportunity to depose Joseph in late January 2022, he testified that "I never said I didn't know about that money, correct. … That was my own money that I put in there."   Ex. 6, Joseph Dep., p. 297:9-13.

198.    Joseph failed to either disclose this income on his 2018 federal tax return or pay a penalty for the early withdraw of these funds.   Ex. 53 (KATZ-287).

199.    In January 2018, Joseph also then caused Vanguard to issue check number 371184 to him and Donna in the amount of $31,856.99.   Ex. 47 (KATZ-265), p. WSFS 000803.

200.    On February 6, 2018, Joseph caused these three checks totaling in excess of $175,000 to be transferred to a Beneficial Bank account titled solely in Donna's name (account number *4446).   Ex. 47 (KATZ-265), p. WSFS 000803.

201.    Joseph did not disclose any of these transactions involving Vanguard in his answers to Katz's discovery in aid of execution.   *See* Ex. 8 (KATZ-8), ¶¶ 28, 34; Ex. 9 (KATZ-8a), ¶¶ 28, 34.

202.    Joseph also did not disclose any of these transactions to the Internal Revenue Service in December 2021, when he belatedly filed his 2018, 2019 and 2020 tax returns and turned those tax returns over to Plaintiff.

**2.    Joseph Lied about His 631 East Elm Street Rental Income**

203.    Joseph also hid rental income from his creditors.

204.    Joseph owns a house located at 631 East Elm Street, Conshohocken, Pennsylvania, which he has rented to Miguel Sigala and Gloria Solorzano-Eustacio.

205.    Rent checks for 631 East Elm Street were made payable to Joseph personally.   *See*, *e.g.*, Ex. 44 (KATZ-245), pp. WSFS 002390, 2392, 2434; Ex. 6, Joseph Dep., p. 232:7-9.

206.    At various times, Joseph deposited the rent checks into bank accounts titled in the names of Defendants (a) Iron Hill (Ex. 58 (KATZ-318), pp. WSFS 000858, 869; Ex. 6, Joseph Dep., p. 240:7-12), (b) Donna (*see, e.g.* Ex. 47 (KATZ-265), pp. WSFS 0000791, 820) and (c) Melissa (Ex. 44 (KATZ-245), pp. WSFS 002390, 2392, 2434).

207.    Joseph used Melissa's Beneficial bank account to hide various income, including the rent from 631 East Elm Street, from his creditors from at least November 2015 through at least March 2019.   Ex. 44 (KATZ-245).

208.     Joseph concealed and failed to disclose this income to the Trustee during his October 31, 2016 deposition.  *See* Ex. 5, Joseph Oct. 31, 2016 Dep., p. 53:8-20.

209.     Despite receiving these rental payments and other payments on behalf of Joseph, and in furtherance of the Defendants' conspiracy, on June 17, 2021, Melissa falsely testified under oath that she: (a) never did any banking for her father; (b) never allowed her father to use her bank accounts; and (c) never held any property for her father.   Ex. 7, Melissa Dep., p. 45:22-46:6.

210.     When specifically asked about the Beneficial Account XXXXXX2202, she lied stating that all the deposits and other transactions in the account were her own.   Ex. 7, Melissa Dep., pp. 55:16:-61:3.

211.     However, the checks deposited into Melissa's XXXXXX2202 account were either made payable to Joseph or checks for Joseph that were made payable to Donna, rather than checks made payable to Melissa.   *See* Exs. 44 (KATZ-245), 45 (KATZ-246).

212.     Indeed, Joseph admitted that Melissa would then give the rental income she received and held in her accounts for Joesph's benefit back to Joseph when he needed money.   Ex. 6, Joseph Dep., p. 233:13-16.

213.     To further avoid his creditors, at some point in time, Joseph had Miguel Sigala and Gloria Solorzano-Eustacio make their rent checks for 631 East Elm Street payable to Donna, rather than himself.   *See*, *e.g.* Ex. 47 (KATZ-265), pp. WSFS 0000831, WSFS000832.

214.     Joseph used Donna's bank account to hide various income, including the rent from 631 East Elm Street, from his creditors through at least late 2020.   Ex. 47 (KATZ-265).

215.     Later to further hide the rental income, Joseph caused these rent payments to be sent via Venmo to an account in Donna's name.   *See*, *e.g.,* Ex. 60, p. PAYPAY000016, 11/24/2020 transaction.

216. At other times, Joseph deposited Miguel Sigala and Gloria Solorzano-Eustacio's rent checks payable to him into Iron Hill's bank account.   Ex. 58 (KATZ-318).

217. To further conceal these rent payments from Plaintiff, Joseph provided false discovery responses, under penalty of perjury.   Specifically, he stated in March 2021 that he did not rent property, including 631 East Elm St., to anyone.   Ex. 8 (KATZ-8), p. 9.

218. In Amended Answers to Interrogatories verified on April 23, 2021, he stated that Miguel Sigala and Gloria Solorzano-Eustacio paid no rent.   Ex. 9 (KATZ-8a), p. 9; Ex. 6, Joseph Dep., pp. 229:22-230:1.

219. In both responses, Joseph failed to disclose any rental income from 631 East Elm Street when asked to disclose any other source of income in he received in the past six years.   *See* Ex. 8 (KATZ-8), p. 19; Ex. 9 (KATZ-8a), p. 19-20.

220. Joseph also provided false testimony to Plaintiff by stating that Miguel Sigala and Gloria Solorzano-Eustacio either did not pay him rent or paid "some nominal amount."   Ex. 6, Joseph Dep., p. 230:2-19.

221. Joseph further failed to either disclose his rental income from 631 E. Elm Street on his 2018, 2019 and 2020 federal tax returns.   Exs. 53 (KATZ-287), 54 (KATZ-288), 55 (KATZ-289).

222. Joseph also caused Iron Hill to pay expenses incurred by Joseph in connection with the ownership and/or operation of 631 East Elm Street.

223. For example, in 2020, Iron Hill paid Joseph's sewer service bills for 631 East Elm Street.   Ex. 35 (KATZ-215), pp. 3, 11, 92; Ex. 1, Kaplan Dep., pp. 165:23-168:2; Ex. 6, Joseph Dep., p. 319:12-22.

224.    When asked why Iron Hill would be paying his personal sewer bill for 631 East Elm Street, Joseph said Iron Hill was "probably doing me a favor, helping me out."   Ex. 6, Joseph Dep., p. 319:15-22.

3.      **Joseph Hid and Lied about Income from Fels Supply Company**

225.    Joseph also used Donna and Melissa and their bank accounts to hide rent paid by Fels Supply Company ("Fels") from his creditors.

226.    Through his transactions with Fels, Joseph transferred well in excess of $65,000 to Donna or Melissa.

227.    Joseph leased the property at 579 E. Lafayette Street in his Norristown, Pennsylvania from an entity controlled by his father, Michael Grasso.[1]   Ex. 5, Joseph Oct. 31, 2016 Dep., p. 30:9-19.

228.    At some point on or before 2014, Joseph subleased a garage located at 579 E. Lafayette Street to Fels.   Ex. 5, Joseph Oct. 31, 2016 Dep., p. 30:9-19; Ex. 49 (KATZ-275).   In other words, the sublease was created before Iron Hill existed.

229.    Joseph had negotiated the rental agreement with Steve Fels.   Ex. 1, Kaplan Dep., p. 264:17-24.

230.    Pursuant to this sublease arrangement, Joseph received $1,400 per month since at least January 2017 until December 2020.   Ex. 5, Joseph Oct. 31, 2016 Dep., p. 30:9-19 ("he pays me 1400 a month"); Ex. 50 (KATZ-276), Ex. 51 (KATZ-278).

---

[1] Joseph's father, Michael Grasso, is not the same person as Defendant Michael Grasso, who is Joseph's son.

231.    Joseph had Fels make the rent checks payable to Donna, however, rather than having the check for this sublease made payable to him.   *See, e.g.*, Ex. 50 (KATZ-276), Ex. 51 (KATZ-278).

232.    Joseph then caused these Fels' rent checks to be deposited into either Donna or Melissa's bank accounts.   Ex. 4, Donna Dep., pp. 285:2-286:5; *see, e.g.,* Ex. 47 (KATZ-265), pp. WSFS 000793, 845, 853; Ex. 44 (KATZ-245) pp. WSFS 002388, 2427.

233.    Donna has never leased space to anyone and has never been involved with any business.   Ex. 3, Donna Dep., pp. 79:14-24, 81:11-13.

234.    Donna further had no involvement with creating or negotiating the lease with Fels. In fact, she understood that Fels rented its space from Iron Hill.   Ex. 3, Donna Dep., pp. 200:15-201:15.

235.    On October 21, 2020, Iron Hill provide a written notice of lease termination to Fels, advising that Fels "is on a Month to Month lease *with Iron Hill Company*."   Ex. 14 (KATZ-69) (emphasis added).

236.    Joseph further increased his personal income and hid his assets from creditor, by having Iron Hill pay all expenses associated with his sublease to Fels Supply.

237.    When asked why Fels was paying rent to Joseph on the sublease if Iron Hill was the tenant on the prime lease and was paying all the expenses for the property, Kaplan testified: "I have no response to that, other than that [is] what was customary and that is what was done." Ex. 1, Kaplan Dep., p. 265:5-10.

### 4.    Joseph Fraudulently Transferred Funds for Dodds Lane

238.    Joseph used funds he owned or controlled to improve the Dodds Lane Property.

239.    As discussed above, in February 2018, Joseph caused over $175,000 of funds he

controlled in his name and/or his and his wife's name at Vanguard to be transferred to a Beneficial

Bank (n/k/a WSFS) account titled solely in his wife's name.   *See* Ex. 6, Joseph Dep., p. 312:15-

20.

240.     Joseph then caused a substantial portion of those Vanguard funds to be withdrawn

to improve the Dodds Lane Property.

241.     By way of example only, in February 2018, a $45,000.00 check from Donna's

Beneficial Bank account was used to pay Radon Construction LLC for new windows at the Dodds

Lane Property.   *See* Ex. 6, Joseph Dep., pp. 258:24-260:22.

242.     However, Donna does not even know who Radon Construction is or why large

checks were being written out of her account to Radon Construction.   Ex. 4, Donna Dep., pp.

314:22-23, 318:13-17.   Donna also does not even know whose windows were being paid for.   *Id*.

at 315:10-12.

243.     Donna did not know what these funds were used for because Joseph, not Donna,

controlled the funds and use them as he saw fit.

244.     Prior to the November 2018 explosion at the house, other large checks (*e.g*. J Fab

Design, Stair Works, AC-DE Scorp) were written out of Donna's accounts for improvements to

Dodds Lane without her knowledge or involvement.   *See* Ex. 4, Donna Dep., pp. 323:3-325:13.

245.     Joseph would sign Donna's name to checks written on her account for construction

for the Dodds Lane Property.   Ex. 6, Joseph Dep., pp. 264:17-265:16.   Thus, some of the checks

for the Dodds Lane Property were not signed by Donna at all, but were signed by Joseph, who

controlled Donna's account.   *See* Ex. 48 (KATZ-266A), p. WSFS 000769.

246.     Indeed, Joseph used Donna's bank accounts as a conduit to both hide and to

fraudulently transfer hundreds of thousands of dollars' worth of his personal funds for

improvements to the Dodds Lane Property.

      **E.**    **THE DEFENDANTS ACTIONS HINDERED AND DELAYED THE DISCOVERY OF THEIR ON-GOING SCHEME AND FRAUDULENT TRANSFERS**

247.    The Defendants covered up their on-going scheme and fraudulent transfers by hindering, delaying and avoiding discovery, in addition to their other actions to hinder, delay and defraud Joseph's creditors.

248.    Joseph deliberately and repeated lied about his assets and business in depositions, filings with the Bankruptcy Court, and responses to discovery requests.

249.    Joseph also provided deliberately false or incomplete interrogatory answers.  For example, he failed to disclose his relationship with Louderback or that Louderback compensated him.  Ex. 6, Joseph Dep., pp. 269:18-270:1; Ex. 9 (KATZ-8A), p. 18-19 (¶ 31).

250.    Joseph also failed to disclose any details of the amount of money he transferred to improve the Dodds Lane Property.   Ex. 9 (KATZ-8A), p. 17-18; Ex. 6, Joseph Dep., pp. 254:9-258:14.

251.    Joseph deliberately failed to disclose the Fels rental income in his interrogatory answers.   Ex. 6, Joseph Dep., p. 296:7-22.   He failed to disclose more than $160,000 in income from USRA (a company owned by his father).   Ex. 9 (KATZ-8A), p. 19-20 (¶ 34); Ex. 6, Joseph Dep., pp. 293:20-294:13.

252.    Donna lied at depositions about her husband's assets and his businesses, and lied to the Bankruptcy Trustee to hide the same.

253.    Melissa lied at her deposition about her father's assets and the use of her bank accounts to hide his assets, and withheld documents.  *See*, *e.g.*, Ex. 7, Melissa Dep., pp. 25:11-26:1, 45:22-46:6; Ex. 10 (KATZ-10), ¶ 4.

254.    Melissa allowed other assets such as Iron Hill, Louderback and The Ave to be titled in her name to hinder, delay and defraud her father's creditors.

255.    Donna and Melissa deliberately shielded Joseph's assets by depositing his money into their accounts.

256.    Defendants Joe Jr., Melissa, Michael, Amanda, Nicholas and Kaplan worked with Joseph to hinder, delay and defraud his creditors through the establishment and operation of Louderback.

257.    In response to Plaintiff's discovery in aid of execution, Joseph, Iron Hill, Louderback and Kaplan withheld large troves of financial documents and records (including but not limited to all 2021 financial information).

258.    Joseph also claims that all of Iron Hill's 2018 financial records were thrown out.

259.    Joseph and Kaplan deliberately delayed and postponed depositions in aid of execution to delay Plaintiff's ability to learn information sufficient to bring a claim against the Defendants in an attempt to run out the statute of limitation on various fraudulent transfers.

260.    For well over a decade Joseph and Donna failed to file any tax returns with the Internal Revenue Service or their state counterparts.   *See* Ex. 5, Joseph Oct. 31, 2016 Dep., p. 14:16-21; Ex. 12 (KATZ-17A), Joseph's Document Responses, ⁋ 9; Ex. 2, Donna's Oct. 31, 2016 Dep., p. 12:21-24.   Iron Hill's tax return failed to disclose any compensation paid to its sole officer, Joseph.   *See*, *e.g*., Ex. 20 (KATZ-109).

261.    In or around December 2021, Joseph and Donna, with the assistance of Kaplan, finally filed federal income tax returns for 2018, 2019 and 2020.

262.    The federal income tax returns Joseph and Donna filed in late 2021 failed to disclose well in excess of $200,000 in income, as well as various assets.   *See, e.g.*, Ex. 1, Kaplan Dep., pp. 234:8-235:2.

263.    Joseph admits that he no longer deposits his paychecks into his wife's account, "because you'll [Katz will] take them."   Ex. 6, Joseph Dep., p. 313:4-7.   He further admitted that "I'm trying to protect the money that I'm making, yes." Ex. 6, Joseph Dep., p. 313:17-18.

264.    As set forth above, the Defendants acted to fraudulently conceal Joseph's assets.

265.    The Defendants independent and affirmative actions had the effect of hindering Joseph's creditors, including Plaintiff, from discovering Joseph's assets.

266.    To the extent any particular transfer at issue occurred more than four years prior to this action, then in light of the Defendants' deliberate actions as detailed above, such transfer was not and could not have reasonably been discovered more than a year before the commencement of this action.

## CLAIM I – DECLARATORY JUDGMENT
### (All Defendants)

267.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 266 above as if fully set forth herein.

268.    Pursuant to the federal Declaratory Judgment Act, the Court "[i]n a case of actual controversy within its jurisdiction, … upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."   28 U.S.C. § 2201(a).

269.    Similarly, pursuant to 42 Pa. C.S.A. Section 7532, the Court "shall have power to declare rights, status and other legal relations whether or not further relief is or could be claimed."

270.    There is a question about whether assets titled in the name of Iron Hill and

Louderback are Joseph's assets or constitute his alter ego.

271.    Pursuant to 42 Pa. C.S.A. Section 7538, it is necessary and proper for the Court to issue a declaratory judgment concerning the ability of Plaintiff to execute on those assets in light of Plaintiff's Judgment.

272.    Joseph used his control over Iron Hill and Louderback to further his own personal interests.

273.    Joseph also uses Iron Hill and Louderback's assets to further his own personal interests.

274.    Iron Hill and Louderback failed to adhere to corporate formalities.

275.    Joseph substantially intermingles Iron Hill and Louderback's corporate affairs with his personal affairs.

276.    Joseph uses Iron Hill and Louderback's corporate forms to perpetrate a fraud on his creditors.

277.    Iron Hill and Louderback are merely façades for Joseph's operations.

278.    Iron Hill and Louderback's existence as entities independent of Joseph is pure fiction meant to hinder, delay and defraud creditors.

## CLAIM II – FRAUDULENT TRANSFER
### (All Defendants - 12 Pa. C.S.A. § 5104(a))

279.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 278 above as if fully set forth herein.

280.    The actions of the Defendants as related to the multiple transfers of property as set forth above constitute violations of Pennsylvania Uniform Voidable Transactions Act ("PUVTA"), 12 Pa. C.S.A. Section 5101, *et seq*.

281.    As set forth above, Joseph transferred property to Donna with actual intent to

hinder, delay or defraud his creditors in violation Section 5104 (a)(1) of PUVTA.

282.    As set forth above, Joseph transferred property to Melissa with actual intent to hinder, delay or defraud his creditors in violation Section 5104 (a)(1) of PUVTA.

283.    As set forth above, Joseph transferred Iron Hill and Louderback's money to Joe Jr., Melissa, Michael, Amanda, Nicholas and Andres with actual intent to hinder, delay or defraud his creditors in violation Section 5104 (a)(1) of PUVTA.

284.    As set forth above, Joseph transferred Iron Hill's business and property to Joe Jr., Melissa, Michael, Amanda, Nicholas and Kaplan with actual intent to hinder, delay or defraud his creditors in violation Section 5104 (a)(1) of PUVTA.

285.    As set forth above, Joseph, individually or on behalf of those other Defendants, transferred property to the other Defendants with actual intent to hinder, delay or defraud Joseph's creditors, including Plaintiff, in violation Section 5104 (a)(1) of PUVTA.

286.    In accepting the transfers at issue, Donna, Joe Jr., Melissa, Michael, Amanda, Nicholas, Kaplan, and Andres, did not act in good faith.

287.    The transfer of Joseph's property, either directly or through other Defendants, to Donna, Joe Jr., Melissa, Michael, Amanda, Nicholas, Kaplan, and/or Andres, constituted a fraudulent transfer within the meaning of the Section 5104 (a)(1) of PUVTA.

288.    In the alternative, Donna did not pay reasonably equivalent value to Joseph for the property she received from him.

289.    In the alternative, Melissa did not pay reasonably equivalent value to Joseph for the property received from him.

290.    In the alternative, Joe Jr., Melissa, Michael, Amanda, Nicholas, Kaplan, and/or Andres did not pay reasonably equivalent value to Joseph for the property received from him.

291.     After the transactions at issue, Joseph's remaining assets were unreasonably small in relation to the transfers at issue.

292.     Joseph believed or reasonably should have believed that as a result of the transfers at issue, he would incur debts beyond his ability to pay as the debts became due, in violation Section 5104(a)(2) of PUVTA.

## CLAIM III – FRAUDULENT TRANSFER
### (All Defendants - 12 Pa. C.S.A. § 5105(a))

293.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 292 above as if fully set forth herein.

294.     Joseph believed or reasonably should have believed that as a result of the transfers at issue, he would incur debts beyond his ability to pay as the debts became due, in violation Section 5104(a)(2) of PUVTA.

295.     The transfers of property as set forth above is voidable under Section 5105(a) of PUVTA as (a) Plaintiff's claim arose before the transfers were made, (b) Joseph made the transfers without receiving a reasonably equivalent value in exchange for the transfer, and (c) Joseph was insolvent at that time of the transfers.

## CLAIM IV – AIDING AND ABETTING
### (Against All Defendants except Andres)

296.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 295 above as if fully set forth herein.

297.     Joseph deliberately and wrongly fraudulently transferred and hid his assets from his creditors, including Plaintiff.

298.     Each of the Defendants (with the exception of Andres) knew of Joseph's acts to fraudulently transfer and hide his assets from his creditors.

299.    Each of the Defendants (with the exception of Andres) knowingly and substantially participated in Joseph's wrongdoing.

300.    As detailed above, the Defendants knowingly and substantially participated in the foregoing scheme by engaging in various overt acts in furtherance of that scheme, including depositing checks known to be made payable to Joseph into their accounts, titling property in the name of persons other than Joseph, and by signing documents to fraudulently transfer and hide Joseph's assets.

**CLAIM V – CIVIL CONSPIRACY**
**(Against All Defendants except Andres)**

301.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 300 above as if fully set forth herein.

302.    Each of the Defendants with the exception of Andres, combined or agreed to act with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose.

303.    Each of the Defendants (with the exception of Andres) shared a common unlawful purpose of effectuating the fraudulent transfer and concealment of Joseph's assets and interfere with the rights of Joseph's creditors.

304.    Each of the Defendants (with the exception of Andres) performed one or more overt acts, as set forth above, in pursuance of their common purpose.

305.    As set forth above, the Defendants (with the exception of Andres) assisted Joseph in furthering and participating in the fraudulent conveyance of Joseph's assets so that their creditors could not reach those assets.

306.    Plaintiff was, and continues to be, damaged by Defendants (with the exception of Andres), as she has been unable to collect the Judgment.

43

307.    The conduct of each of the Defendants (with the exception of Andres) as set forth above was outrageous as it was done with a bad motive or with a reckless indifference to the interest of Joseph's creditors, including Marshall and Plaintiff as his successor.

**WHEREFORE**, Plaintiff requests that this Court enter judgment in her favor and against the Defendants and that the Court:

    a.  declare that the Iron Hill Company is the property of Defendant Joseph Grasso and may be executed against by Plaintiff;

    b.  declare that The Louderback Group, LLC is the property of Defendant Joseph Grasso and may be executed against by Plaintiff;

    c.  declare that The Louderback Group, LLC is the successor in interest to Iron Hill Company;

    d.  appoint a financial monitor to review and oversee Iron Hill Company and The Louderback Group, LLC's financial transactions on an on-going basis;

    e.  enjoin Joseph Grasso and Donna Grasso from using the assets, including the debit and credit cards of Iron Hill Company and The Louderback Group, LLC or from incurring any charge (including, but not limited to, charges on PayPal, Venmo or Amazon) to be deducted from or paid by Iron Hill Company and The Louderback Group, LLC;

    f.  enjoin the transfer of all assets of the Iron Hill Company and The Louderback Group, LLC, except for the necessary payments of their creditors in the ordinary course, subject to the other limitations requested herein;

    g.  enjoin Iron Hill Company and The Louderback Group, LLC from making any payments to, or for the benefit of, any of the individual Defendants, with the sole exception that The Louderback Group, LLC may continue to (i) pay Joseph Grasso, Jr. and Nicholas their current salary for as long as they each works for The Louderback Group, LLC and (ii) may make semi-monthly payments of $6,000.00 to Bruce Kaplan for as long as he serves of the Chief Financial Officer of The Louderback Group, LLC; and (iii) reimburse Joseph Grasso, Jr., Nicholas Grasso, and Bruce Kaplan for legitimate and verified expenses incurred in the ordinary course of business;

    h.  enjoin the Defendants from forming any new entity to compete in the construction business;

i.   void and set aside all of Defendant Joseph Grasso's transfers to Defendant Donna Grasso from January 2017 to date;

j.   void and set aside all of Defendant Joseph Grasso's transfers to Defendant Melissa Russo from January 2017 to date;

k.   void and set aside all of Defendant Iron Hill Company's transfers to Defendant Donna Grasso from January 2017 to date;

l.   void and set aside all of Defendant The Louderback Group, LLC's Company's transfers to Defendant Donna Grasso from November 2020 to date;

m.   void and set aside all of Defendant Iron Hill Company's transfers to Defendant Joseph Grasso, Jr., Melissa Ann Russo, Michael Grasso, Amanda Russo, Nicholas Grasso and Bruce Kaplan from January 2017 to date, with the exception of any salary paid to Joseph Grasso, Jr., Nicholas Grasso or Bruce Kaplan or the reimbursement of expenses to these individuals with proper documentation approved by the financial monitor;

n.   void and set aside all of Defendant The Louderback Group, LLC's transfers to Defendant Joseph Grasso, Jr., Melissa Ann Russo, Michael Grasso, Amanda Russo, Nicholas Grasso and Bruce Kaplan from November 2020 to date, with the exception of any salary paid to Joseph Grasso, Jr., Nicholas Grasso or Bruce Kaplan or the reimbursement of expenses to these three individuals with proper documentation approved by the financial monitor;

o.   enjoin the Defendants from further transferring, removing, conveying, assigning, encumbering or otherwise disposing of the property of the Iron Hill Company, excepted as further ordered by the Court;

p.   enjoin the Defendants from further transferring, removing, conveying, assigning, encumbering or otherwise disposing of The Louderback Group, LLC's assets (including, but not limited to, equipment, records, contracts and customer lists), excepted as further ordered by the Court;

q.   direct the Defendants to take such action as the Court may direct to preserve the property of Joseph Grasso, Iron Hill Company and/or The Louderback Group, LLC;

r.   direct the Defendants to disclose to the Plaintiff the whereabouts of the property of Joseph Grasso, Iron Hill Company and/or The Louderback Group, LLC;

s.   award Plaintiff punitive damages in light of Defendants' outrageous behavior; and,

t.   award Plaintiff any other relief as the circumstances be deemed just under the circumstances, including the costs of this action.

Dated: March 17, 2022

**MONTGOMERY MCCRACKEN WALKER & RHOADS, LLP**

By:   _s/ David Dormont_

David Dormont (PA ID. No. 66252)
1735 Market Street, 19th Floor
Philadelphia, PA 19103
(215) 772-1500
Email: ddormont@mmwr.com

*Attorneys for Plaintiff Toby Katz*